**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| **JASON SHANN,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil Action No. 12-4822 (ES) (MAH)** |
| | : | |
| **v.** | : | **OPINION** |
| | : | |
| **ATLANTIC HEALTH SYSTEMS d/b/a** | : | |
| **ATLANTIC HEALTH, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

SALAS, DISTRICT JUDGE

Plaintiff Jason Shann ("Plaintiff" or "Shann") is a former employee of Defendant Atlantic Health Systems ("Atlantic Health"). Shann brought this lawsuit against Atlantic Health and his former supervisor, Larry Pierce ("Pierce"), alleging that both Atlantic Health and Pierce (together, "Defendants") discriminated against him based on his disability when they terminated his employment on suspicions of theft.

Defendants moved for summary judgment on all counts alleged in Shann's Complaint. (D.E. No. 95). Having considered the submissions in support of and in opposition to Defendants' motion, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b). For the reasons set forth below, the Court GRANTS Defendants' motion for summary judgment on Counts II, V, VI, and VII, and DENIES-IN-PART and GRANTS-IN-PART Defendants' motion for summary judgment on Counts I, III and IV.

## I. BACKGROUND[1]

### A. The Parties

*Plaintiff.* Shann was hired by Atlantic Health to work in its Information Technology ("IT") Department as a computer support specialist in 2001. (D.E. No. 96 ("Shann Dep. I") at 53:15-25).[2] By 2011, Shann became team leader of Atlantic Health's "Enterprise Desktop Management Team" ("Enterprise Team"). (*Id.* at 55:10-17, 63:6-13).

The Enterprise Team was generally responsible for software development, management of personal computing assets, hardware imaging, administration of antivirus software, and ensuring compliance and security of all the computers used at all Atlantic Health facilities. (D.E. No. 95-2 ("Defs. SMF") ¶ 9). Specifically, as team lead of the Enterprise Team, Shann served as a "leader, both in a technical and supervisory capacity," and "provide[d] a hands-on oversight of . . . the daily operational, maintenance, and oversight of the organization's desktop infrastructure, with an emphasis on developing and implementing new technologies to enhance the quality of services [and] support offered through the enterprise." (*Id.* ¶ 22).

Although he began his employment with Atlantic Health at Overlook Medical Center and later worked out of Atlantic Health's Morris Plains, New Jersey, location, Shann also worked from home. (Shann Dep. I at 60:2-6, 62:14-24). On January 12, 2006, Shann and Atlantic Health entered into a Telecommuting Agreement, which provided that, "as work requires," Shann's

---

[1]       The Court distills these facts from the parties' statements of material facts, affidavits, and exhibits accompanying the parties' submissions. Unless otherwise noted, these background facts are undisputed. Additional facts are provided elsewhere in this Opinion as relevant to the Court's analysis.

[2]       The Court must note that Shann denies many of the Defendants' statements of undisputed material facts, but a significant number of those denials consist of unsupported statements in violation of Federal Rule of Civil Procedure 56(c)(1)(A), legal arguments in violation of Local Civil Rule 56.1, and suspicious distortions of the record. A Rule 56.1 statement "that contains a combination of fact, opinion and legal conclusions presents a significant burden on the Court to determine what facts are disputed by the parties." *Ivan v. Cty. of Middlesex*, 595 F. Supp. 2d 425, 440 n.1 (D.N.J. 2009). The Court will disregard all legal arguments, opinions, and any other portions of the 56.1 statement that extend beyond statements of fact.

telecommute day was on Mondays. (Defs. SMF ¶¶ 40-41). On January 6, 2010, Pierce prepared a "Telecommuting Guidelines-Supplement" for the Enterprise Team that explained that there was no right to telecommute and that "[c]ertain onsite responsibilities may require the staff member to forgo his/her scheduled telecommute day." (*Id.* ¶ 42). In March 2011, Pierce revoked Shann's telecommuting privilege. (*Id.* ¶ 36).

In addition to his work with Atlantic Health, Shann owns Info-Prompt, an IT consulting business that performs software installations, server maintenance, network maintenance, support and recommendations, hardware procurement, and hardware and software implementations. (Shann Dep. I at 138:20-143:13).

***Defendants.*** Atlantic Health is a not-for-profit corporation that owns, among other entities, Overlook Medical Center and Morristown Medical Center. (Defs. SMF ¶ 1). Pierce began working for Atlantic Health in February 1987. (D.E. No. 101-4 ("Pierce Dep. I") at 44:5-6). At all relevant times, Pierce was the manager of an Atlantic Health's client services team, an information security team, and the Enterprise Team. (*Id.* at 28:1-29:2).

### B.  Shann's Health Issues

In November 2010, Shann began to hear crackling and buzzing noises in his left ear. (Defs. SMF ¶ 19). Shann was diagnosed with tinnitus caused by an Eustachian tube dysfunction in his ear. (*Id.*).

Shann's tinnitus issues would often flare up unpredictably and some of these flare-ups were intolerable. (D.E. No. 96-1 ("Shann Dep. III") at 481:18-482:10). The tinnitus flare-ups were "positional-oriented" (*id.* at 482:4-10), often occurring when Shann was in the office sitting upright. (D.E. No. 96-1 ("Shann Dep. II") at 440:3-6). Shann would often find that laying down alleviated the tinnitus flare-ups. (Shann Dep. III at 482:4-10).

Shann's ability to deal emotionally with the tinnitus was also unpredictable. (Shann Dep. II at 437:6-9). In 2010, Shann developed issues with anxiety. (Shann Dep. I at 168:3-11). According to Shann, his tinnitus exacerbated his problem with anxiety. (*Id.* at 199:4-8 ("They feed each other."); *see also* Shann Dep. II at 431:25-432:4). In addition to his anxiety, Shann also suffered from depression. (Shann Dep. III at 478:19-479:41).

### C. Shann's Medical Leave

In December 2010, due to his medical conditions, Shann took time off from work pursuant to the Family Medical Leave Act ("FMLA"). (Defs. SMF ¶ 20). In January 2011, Atlantic Health granted Shann's request for full-time FMLA leave from January 4 to January 25, 2011. (*Id.* ¶ 21).

On January 25, 2011, Shann requested intermittent FMLA leave to begin January 25, 2011. (*Id.* ¶ 24). In his request, Shann indicated that he would be available "daily—as [his] condition improves [and that he would be] out with flare-ups with doctor visits." (*Id.*). In support of this request, Shann's physician executed an "Employee Certification of Health Care Provider" indicating that Shann could return to work on intermittent duty on January 25, 2011. (*Id.* ¶ 23). This certification also stated that Shann had no physical work restrictions and that it was not medically necessary for him to be absent from work during flare-ups. (*Id.*)

On July 25, 2011, Shann requested intermittent FMLA leave from July 25, 2011 to January 25, 2012. (Defs. SMF ¶ 31). In support of this request, Shann's physician submitted a certification that indicated Shann could work on a full-time basis, but not during tinnitus flare-ups. (*Id.* ¶ 30).

Shann took a vacation from August 4 to August 12, 2011. (*Id.* ¶ 32). While on vacation, Shann's tinnitus continued to flare up and he suffered an anxiety attack. (*Id.* ¶ 33).

On August 15, 2011, when Shann returned to work, he contacted Atlantic Health's Disability Coordinator and explained that he needed to go on a full-time leave of absence because

his tinnitus and emotional issues were unbearable. (*Id.* ¶ 34). Shann discussed his options with Atlantic Health's Disability Coordinator and received the forms necessary to request a leave of absence. (*Id.* ¶ 52). Shann submitted FMLA forms via email to Atlantic Health's Disability Coordinator on August 21, 2011. (*Id.* ¶ 54).

### D. Shann's Arrest and Termination

Meanwhile, on August 17, 2011, a member of the Enterprise Team, Abdul Ishaque, asked to meet with Pierce. (D.E. No. 96-2 ("Ishaque Dep. I") at 145:16-147:12). Ishaque relayed that, on August 15, 2011, he took a walk with Shann. (*Id.* at 148:25-149:8). While on the walk, Shann revealed to Ishaque that he was going to take short-term disability, then long-term disability, and then resign his position with Atlantic Health to concentrate on expanding Info-Prompt. (*Id.*). Ishaque also told Pierce that Shann took Atlantic Health equipment home on August 16, 2011. (*Id.*).

While Ishaque was meeting with Pierce, Shann met with Frank McKenna ("McKenna"), Director of Client Services at AHS and Pierce's supervisor. (Shann Dep. I at 201:6-204:4). During this meeting, Shann explained to McKenna his intent to go on extended medical leave. (*Id.*). After meeting with McKenna, Shann then met with Pierce and explained his intent to go on extended medical leave. (Pierce Dep. I at 135:7-137:2).

Later on August 17, 2011, Pierce and Ishaque asked McKenna for a meeting. (D.E. No. 96-2 ("McKenna Dep.") at 111:20-112:12). At the meeting, Ishaque explained to McKenna that Shann had taken "an enormous amount of equipment" from the premises and that Shann's plan was to take disability and later resign his position with Atlantic Health. (*Id.* at 112:15-22). McKenna immediately became concerned about the removed equipment and "information or licensing that might be on . . . all those assets." (Defs. SMF ¶ 64). Since Shann was the

administrator for Atlantic Health's Microsoft Volume Licensing Site—which gave him access to Microsoft software and licensing keys—McKenna was also concerned about the security of those licensing keys. (*Id.* ¶¶ 65, 67).

McKenna then instructed Pierce to contact Human Resources. (*Id.* ¶ 69). Both McKenna and Pierce contacted Van Zimmermann, in-house legal counsel and corporate compliance officer for Atlantic Health, for guidance. (*Id.* ¶ 70). After briefing Zimmermann, Pierce requested to proceed with an investigation, which Zimmermann and Lyn Turner, Director of Human Resources, approved. (*Id.* ¶ 71). Pierce then circulated the request to Alan Robinson, Chief Security Officer for Atlantic Health; Joseph Pasquarosa, Director of Corporate Protection and Security Investigator; and members of a separate "Information Security Team," which included David Morgan, David Mayer, and Mike Hazel. (*Id.*).

The Investigation Report indicated that Ishaque met with Pierce and informed him of Shann's plan to use disability and subsequently tender his resignation. (D.E. No. 108, Ex. 41 ("Investigation Report") at 1). The Investigation Report also indicated that Shann removed from the premises an iPhone, iPad, various flash drives, a new laptop still in its box, two hard disks from his workstation's computer, and his Atlantic Health-issued laptop. (*Id.* at 2). The Investigation Report noted that, on August 16, 2011, Shann was seen making two trips outside the building "carrying what looked to [be] computer hardware on both occasions." (*Id.*). The Investigation Report also noted that Shann did not "punch out at the time lock on August 16, having left work two hours early and failing to notify anyone that he was leaving early or that he need[ed] to remove any hardware." (*Id.*). Although Shann removed two hard drives from his workstation's computer, the Investigation Report indicates the single hard drive that remained in Shann's workstation

contained evidence that over 27,000 files were overwritten by a third-party program designed to make deleted data irretrievable. (*Id.*).

On August 18, 2011, Pasquarosa interviewed Ishaque. (*Id.*). Ishaque again shared the same information he provided to Pierce and McKenna. (*Id.*). Also on August 18, 2011, Steve Win ("Win"), an Atlantic Health employee, informed Pierce that he witnessed Shann leaving the facility with a "considerable amount of computer hardware." (*Id.*). Based on the information that Ishaque provided, the photos of Shann leaving the facility with equipment, and the totality of the circumstances, Pasquarosa recommended contacting the police. (Defs. SMF ¶ 73). A member of Atlantic Health's Security and Protection Services then contacted the Morris Township Police Department ("Township Police"). (*Id.* ¶ 74).

Detective Adam Sutherland and another officer responded to Atlantic Health. Detective Sutherland interviewed and received written statements from Ishaque and Win. (*Id.* ¶¶ 76-80). Pierce provided Detective Sutherland with a list of equipment that was assigned to Shann and photos of Shann existing the building with hardware on August 16, 2011. (*Id.* ¶ 82). Detective Sutherland then prepared an affidavit and received a warrant for Shann's arrest. (D.E. No. 109 ("Sutherland Dep.") at 32:5-14).

Although he was not home when the police arrived, Shann and his attorney subsequently appeared at the headquarters Township Police with items that belonged to AHS. (Defs. SMF ¶ 83). According to the police report, Shann returned eleven items to the police: four laptops, one iPad, three hard drives, one portable DVD-R/RW and RAM Drive, one mouse, and an AC adapter for one of the laptops. (*Id.* ¶ 84). After Shann returned the items, the police arrested him.

On August 22, 2011, Pierce and Constance Werner-Hopkins, a Human Resource Manager, met with Shann and advised him that his employment was terminated effective immediately.

(Shann Dep. II at 346:3-347:13). Pierce and Werner-Hopkins informed Shann that the basis of his termination was (i) the unauthorized removal of equipment; (ii) the unauthorized removal of two proprietary hard drives from his workstation; (iii) the overwriting of over 27,000 files on the one remaining hard drive at his workstation; and (iv) the use of an unauthorized third-party software on Atlantic Health's computer equipment. (Defs. SMF ¶ 6).

### E. Procedural History

Shann initiated this lawsuit on June 22, 2012, in the Superior Court of New Jersey. (D.E. No. 1-2 ("Complaint") at 1-19). On August 1, 2012, Defendants removed the case this Court. (D.E. No. 1).

Shann's Complaint alleges (i) failure to accommodate in violation of New Jersey's Law Against Discrimination ("NJLAD") (Count I); (ii) disability discrimination in violation of NJLAD (Count II); (iii) violation of the FMLA (Count III); (iv) defamation and slander per se (Count IV); (v) intentional infliction of emotional distress (Count V); (vi) abuse of process (Count VI); and (vii) malicious prosecution (Count VII). (*See* Complaint ¶¶ 32-79).

On September 30, 2016, after nearly three years of discovery (*see* D.E. Nos. 10, 90), Defendants filed the instant motion for summary judgment. (D.E. No. 95 ("Mov. Br.")). Shann opposed Defendants' motion. (D.E. No. 106 ("Opp. Br.")). And Defendants replied to Shann's opposition. (D.E. No. 110 ("Reply Br.")).

## II. LEGAL STANDARD

Summary judgment is appropriate under Federal Rule Civil Procedure 56(c) when the moving party demonstrates that there is no genuine issue of material fact, and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*,

477 U.S. 317, 322-23 (1986).[3] "[S]ummary judgment is essentially put up or shut up time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*,

---

[3]    Unless otherwise indicated, all internal citations and quotations marks are omitted, and all emphasis is added.

54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e)(2) (requiring the nonmoving party to "set out specific facts showing a genuine issue for trial"). "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Gleason v. Norwest Mortgage, Inc.*, 243 F.3d 130, 138 (3d Cir. 2001).

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Casualty & Surety Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

## III.  DISCUSSION

### A.  Count II: Disability Discrimination[4]

#### i.  The Parties' Arguments

Defendants advance two arguments in support of their motion for summary judgment on Count II.  First, Defendants argue that Shann cannot establish a *prima facie* case of disability discrimination under the NJLAD because Shann admits that he was not qualified to perform the essential functions of his position.  (Mov. Br. at 14).  Shann responds that he does indeed

---

[4]    The Court will discuss Shann's claim of disability discrimination in Count II before discussing his failure-to-accommodate claim in Count I.  To establish a failure-to-accommodate claim, Shann must first establish a *prima facie* case of disability discrimination, which he alleges in Count II.  *See Tourtellote v. Eli Lilly & Co.*, 636 F. App'x 831, 8490 (3d Cir. 2016) (explaining that a plaintiff who alleges a failure-to-accommodate claim must first establish a *prima facie* case of disability discrimination and then establish the elements of a failure-to-accommodate claim); *Boles v. Wal-Mart Stores, Inc.*, No. 12-1762, 2014 WL 1266216, at *12 (D.N.J. Mar. 26, 2014) ("In a failure to accommodate case of disability discrimination, a plaintiff must first present the prima facie elements required in any NJLAD disability discrimination claim.").  Accordingly, the Court begins its analysis with Count II.

establishes *prima facie* case of discrimination because Defendants had no issues with his performance prior to his termination. (Opp. Br. 12-14).

Second, Defendants contend that, even if Shann is able to make a *prima facie* showing of disability discrimination, "there is no evidence from which a fact-finder could reasonably conclude that [Atlantic Health's] legitimate, non-discriminatory reason for his termination was pretextual." (Mov. Br. at 15). Shann counters that he has produced sufficient facts to demonstrate that his disability was a motivating factor behind his termination. (Opp. Br. at 14-18).

### ii. Analysis

#### a. Disability Discrimination Under NJLAD

NJLAD prohibits discrimination of individuals because of any present or past disability. *See* N.J.S.A. 10:5-4.1. Disability-discrimination claims under the NJLAD follows a burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 849 (3d Cir. 2016); *see also Victor v. State*, 203 N.J. 383, 408 (2010) (applying *McDonnell Douglas* to an NJLAD disability-discrimination claim). Under this framework, a plaintiff alleging discrimination bears the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. The New Jersey Supreme Court described this initial burden as "rather modest," but noted that "it remains the plaintiff's burden nonetheless." *Victor*, 203 N.J. at 408.

To establish a *prima facie* case of disability discrimination for a termination, a "plaintiff must demonstrate: (1) that plaintiff is in a protected class; (2) that plaintiff was otherwise qualified and performing the essential functions of the job; (3) that plaintiff was terminated; and (4) that the employer thereafter sought similarly qualified individuals for that job." *Id.*

Satisfying these four elements gives rise to a rebuttable presumption of discrimination. *See Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 210 (1999). The burden then shifts to the defendant "to articulate a legitimate, nonretaliatory or nondiscriminatory reason for its actions." *Tourtellotte*, 636 F. App'x at 842. The defendant's burden to "articulate some legitimate, nondiscriminatory reason" is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). To satisfy this burden, a defendant may "introduce[e] evidence which, taken as true, would permit a trier of fact to conclude that unlawful discrimination was not the reason for discharge." *Cinelli v. U.S. Energy Partners*, 77 F. Supp. 2d 566, 577 (D.N.J. 1999).

Once the defendant has put forth a legitimate reason for the plaintiff's termination, the burden shifts back to the plaintiff. *Id.* The plaintiff must then "demonstrate that the employer's stated reasons were not its true reasons but were a pretext for discrimination." *Lawrence v. Nat'l Westminster Bank N.J.*, 98 F.3d 61, 66 (3d Cir. 1996). At summary judgment, the plaintiff may overcome this burden in two ways: "(1) by discrediting the proffered reasons for termination, directly or circumstantially, or (2) by adducing evidence that discrimination was more likely than not a motivating or determinative cause of the adverse action." *Id.*

### b. Shann Has Established a *Prima Facie* Case of Disability Discrimination

To resolve Defendants' motion for summary judgment on Count II, the Court must determine, as a threshold matter, whether an issue of material fact exists as to Shann's ability to perform the essential functions of his position with Atlantic Health. Although the parties do not dispute that Shann suffered from a disability as defined by NJLAD (*see* Mov. Br. at 12-16; Opp. Br. at 5), the parties disagree over whether Shann "was otherwise qualified and [able to] perform the essential functions of the job." *Victor*, 203 N.J. at 408; (*see* Mov. Br. at 14; Opp. Br. 12-14).

To establish whether a plaintiff was able to perform the essential functions of his position, with or without a reasonable accommodation, "[a]ll that is necessary is that the plaintiff produce evidence showing that [he] was actually performing the job prior to the termination." *Zive v. Stanley Roberts, Inc.*, 182 N.J. 436, 455 (2005); *see Guarneri v. Buckeye Pipe Line Servs. Co.*, 205 F. Supp. 3d 606, 615 (D.N.J. 2016) (explaining that an objective standard is used to evaluate the second prong). Evidence indicating a plaintiff's "longevity in the position at issue" or testimony that plaintiff had been working "within the title from which [he] was terminated" would be sufficient to establish this element. *Zive*, 182 N.J. at 455.

Here, Shann points the Court to one piece of evidence demonstrating that Shann "was actually performing the job prior to the termination." *Zive*, 182 N.J. at 455. Pierce testified that "during the entire time" Shann was lead of the Enterprise team, his quality of work was "good." (Pierce Dep. I at 106:21-24). Drawing all reasonable inferences in Shann's favor, the Court finds this evidence sufficient for a reasonable jury to find that Shann had been working "within the title from which [he] was terminated." *Zive*, 182 N.J. at 455 (explaining that this element is not a heavy burden to meet). Thus, Shann has pointed the Court to sufficient evidence to survive summary judgment at the *prima facie* stage.[5] *See Thomasian v. New Jersey Inst. of Tech.*, No. 08-2218,

---

[5] The Court must reject Defendants' invitation to apply a different, more arduous burden at the *prima facie* stage. According to Defendants, Shann is required "to show that he 'was performing this job at a level that met his employer's expectations.'" (Mov. Br. at 14 (citing *Viscik v. Fowler Equipment Co.*, 173 N.J. 1, 14 (2002)). To that end, Defendants would require Shann to provide evidence that his disability "did not unreasonably hinder his job performance." (Mov. Br. at 14 (citing *Jansen v. Food Circus Supermarkets, Inc.*, 110 N.J. 363, 382 (1988)).

Defendants' request for the Court to consider their subjective assessment of Shann's performance is premature. The New Jersey Supreme Court has unequivocally stated that, "[b]ecause performance markers like poor evaluations are more properly debated in the second and third stages of the burden-shifting test, they do not come into play as part of the second prong of the *prima facie* case." *Zive*, 182 N.J. at 455. Indeed, the Court will only examine the Defendants' subjective expectations at "the pretext stage of a LAD case." *Id.* (citing *Viscik*, 173 N.J. at 21). "[A]ny other interpretation would ratchet up the second prong in a termination case and upend the complex evidentiary edifice built by *McDonnell Douglas*." *Id.*

2010 WL 1032653, at *4 n.16 (D.N.J. Mar. 16, 2010) (giving the plaintiff the benefit of the doubt at the summary judgment stage and moving past the *prima facie* step upon a showing that he was actually performing his job prior to his termination despite the record showing the plaintiff was repeatedly admonished for his job performance).

Shann has established that he was able to perform the essential functions of his position, with or without a reasonable accommodation. Accordingly, the burden shifts to Defendants to "articulate some legitimate, nondiscriminatory reason" for Shann's termination. *Fuentes*, 32 F.3d at 763.

### c. Atlantic Health has Articulated a Legitimate, Nondiscriminatory Reason for Shann's Termination

An employer satisfies its burden of providing a legitimate, nondiscriminatory reason for an adverse employment action "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes*, 32 F.3d at 763 (describing the burden of articulating a legitimate reason for the adverse employment decision as "relatively light"). Notably, however, "[t]he employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.*

Here, Atlantic Health has met its burden to show of a legitimate, nondiscriminatory reason for terminating Shann's employment. Specifically, Atlantic Health provides four reasons for Shann's termination: (1) his removal of Atlantic Health equipment and software from the facility without authorization; (2) his removal of proprietary hard drives from his workstation's computer without authorization; (3) his overwriting of more than over 27,000 files from his workstation's computer; and (4) his unauthorized use of a third-party program on Atlantic Health computing

14

equipment. (Mov. Br. at 15). Sufficient evidence exists in the record to support these legitimate grounds for termination. *See Jones v. Yonkers Pub. Sch.*, 326 F. Supp. 2d 536, 534-44 (S.D.N.Y. 2004) (misconduct, poor performance, and violation of employer's rules and procedures are legitimate, non-discriminatory reasons for termination); *see also Dumas v. New United Motor Mfg., Inc.*, 305 F. App'x 445, 448 (9th Cir. 2008) (holding that violating company policy is a legitimate, non-discriminatory reason for terminating employee).

It should be no surprise that "the removal of [Atlantic Health] equipment and software from the facility without authorization" could precipitate Shann's termination. Atlantic Health's employment policies unequivocally state that behavior that warranting immediate termination is "theft, misappropriation, or unauthorized possession of property belonging to Atlantic Health System." (D.E. No. 108, Ex. 53 at 2; *see also* D.E. No. 108, Ex. 54 at 3 (advising employees that unauthorized removal of Atlantic Health's equipment may result in immediate discharge)). Here, Atlantic Health's corporate investigator reviewed security video tapes from August 16, 2011. (Defs. SMF ¶ 72). In these videos, Shann is seen "carrying what looked to [be] computer hardware on both occasions." (*Id.*). Shann also "fail[ed] to notify anyone . . . that he had a need to remove any hardware." (*Id.*). Notably, Shann does not deny that he removed Atlantic Health property from the premises nor that he failed to notify anyone that he removed the property from the premises. (Pl. RSMF ¶ 72(a)).

Additionally, Atlantic Health terminated Shann for "the removal of proprietary hard drives from his workstation's computer without authorization." (Mov. Br. at 15). At his workstation, Shann had a desktop computer containing three hard drives. (Defs. SMF ¶ 72(b)-(c); Shann. Dep. I at 223:5-224:17). On August 16, 2011, Shann removed two hard drives from the desktop computer by "pop[ping] the case off, unplug[ging] it, and tak[ing] [them] out." (Shann Dep. I at

224:1-2). Shann did not ask for authorization before removing the hard drives and taking them home. (Shann Dep. II at 301:13-22). When he met with them on August 17, 2011, Shann did not inform Pierce or McKenna that he took the two hard drives home. (*Id.* at 301:24-302:6).

Lastly, Atlantic Health also terminated Shann for using an "unauthorized . . . third-party program" to "overwrit[e] . . . over 27,000 files from his workstation's computer." (Mov. Br. at 15). Notably, the record indicates that the third-party program was run on August 16, 2011. (D.E. No. 108, Ex. 50 ("Forensic Analysis Report") at 7). The deleted files included files that belonged to Atlantic Health and files that belonged to Shann's personal business. (*Id.*).

Based on the foregoing, the Court finds that Atlantic Health has satisfied its burden of "introducing evidence which, *taken as true*, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes*, 32 F.3d at 763. "Once the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by the preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." *Id.*

### d. Pretext

The standard of proving pretext "places a difficult burden on the plaintiff." *Fuentes*, 32 F.3d at 765. "Pretext is a purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs; in essence, pretext is a cover-up for a discriminatory purpose." *Bowles v. City of Camden*, 993 F. Supp. 255, 262 (D.N.J. 1998).

"To demonstrate pretext under the summary judgment standard, a plaintiff must either (1) offer evidence that casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonable conclude that each reason was a fabrication, or (2)

present evidence sufficient to support an inference that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Shahin v. Delaware*, 563 F. App'x 196, 199 (3d Cir. 2014).

The Court must note that, "at the pretext stage it is not a court's role to rule on the strength of cause for discharge. The question is not whether the employer made the best, or even sound, business decision; it is whether the real reason is discrimination." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 647 (3d. Cir. 2015). If Shann "fails to raise a genuine factual dispute concerning the employer's legitimate and non-discriminatory explanation for the alleged discriminatory act, [Defendants] [are] entitled to summary judgment." *Brewington v. Sunbridge Regency N. Carolina, Inc.*, No. 06-1112, 2007 WL 4522619, at *3 (M.D.N.C. Dec. 18, 2007).

**First Method of Proving Pretext.** One way to show pretext is to "point to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action." *Willis*, 808 F.3d at 644. "In order to raise sufficient disbelief, the evidence must indicate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons." *Id.* at 644-45. Stated another way, a plaintiff must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005); *see also Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999) (requiring plaintiff to show "that the employer's articulated reason was not merely wrong, but that it was so plainly wrong that it cannot have been the employer's real reason").

Here, Shann's evidence fails to cast sufficient doubt upon Atlantic Health's reasons for terminating him. No reasonable trier of fact could conclude that the articulated reasons for Shann's

termination were "so clearly wrong as to imply discriminatory animus." *Ade v. KidsPeace Corp.*, 401 F. App'x 697, 704 (3d Cir. 2010).

### 1. Authorization to Remove Atlantic Health Equipment

First, Shann disputes Atlantic Health's contention that he was not authorized to remove computer equipment. (*See* Opp. Br. at 15). According to Shann, since the equipment he removed was "essential for him to perform his job," Shann maintains that he removed the equipment with Atlantic Health's authorization. (*Id.*). The Court is not persuaded.

Shann has not pointed the Court to evidence suggesting that, merely because the equipment was—according to him—essential for him to perform his job, he was necessarily authorized to remove the equipment on August 16, 2011. Instead, Shann generally avers that he often worked from home and the equipment he took home on August 16, 2011 was "essential for him to perform his job." (Opp. Br. at 15). But Shann's belief that the equipment was essential for him to perform his job at home is irrelevant to whether Atlantic Health authorized him to remove the equipment on August 16, 2011. (*See* Shann Dep. I at 127:3-11 (stating that he was "entitled" to the removed equipment)); *see Jones*, 198 F.3d at 414 (concluding that a plaintiff's personal belief, without factual support, is insufficient to show a pretext for discrimination). Accordingly, Shann's subjective belief that he was authorized to remove equipment on August 16, 2011 is insufficient to create a genuine issue of material fact on this issue. *See id.*; *see also Martin v. Health Care & Ret. Corp.*, 67 F. App'x 109, 113 (3d Cir. 2003) (explaining that the employer's belief, rather than the plaintiff's subjective belief, governs).[6]

---

[6] Indeed, evidence in the record suggests the opposite conclusion: that Shann did not have authorization to remove equipment on August 16, 2011. For example, Shann contends that he was authorized to remove two hard drives from his workstation because "he needed them to work remotely." (Opp. Br. at 16). McKenna, however, testified that "there was no work-related reason to take" his workstation's hard drives home. (McKenna Dep. at 140:15-18). Moreover, the 2006 Telecommuting Agreement between Atlantic Health and Shann provides

Shann cites a supplement to the 2006 Telecommuting Agreement as evidence of authorization to remove equipment on August 16, 2011, but Shann's reliance on the supplement is unavailing. (*See* Opp. Br. 15-16; Pl. CSMF ¶ 10). According to Shann, he was authorized to remove equipment on August 16, 2011, because the supplement requires him to "have available [at home] both infrastructure and equipment to allow [him] to perform work equivalent to that performed onsite." (D.E. No. 108, Ex. 31 at 2). Although Shann seizes on the apparent ambiguity of "infrastructure and equipment" to create authority to take home Atlantic Health equipment, the subsequent lines explain that "infrastructure and equipment" mean broadband internet, telephone access, pager, and a computer. (*Id.*). Thus, the 2006 telecommuting supplement provides no support for Shann's argument that he was "authorized to remove computer equipment" on August 16, 2011. (Opp. Br. at 15).

Next, Shann argues that even if a policy on the removal of equipment existed, it was not followed, and that McKenna and Pierce were aware that Enterprise Team members would "routinely remove[] equipment without authorization." (Opp. Br. at 16 (citing Pl. CSMF ¶¶ 2(g), 15(i)). The record, however, does not support Shann's broad assertion. Shann cites testimony from an Enterprise Team member for the proposition that Atlantic Health equipment routinely would be taken home without authorization; but the testimony actually states that the only piece of equipment "brought back and forth all the time" was the Enterprise Team member's laptop—not computer equipment generally. (D.E. No. 101 ("Morici Dep.") at 31:17-21). Indeed, none of Shann's record citations support the existence of an informal policy that would create a genuine issue of material fact as to whether Shann was authorized to remove computer equipment on August 16, 2011.

<hr>

authorization to remove his "laptop computer with power cord," but is silent with respect to any other equipment. (D.E. No. 108, Ex. 29 at 7).

To be sure, the record does support the proposition that McKenna and Pierce were aware that Enterprise Team members removed *mobile devices* (such as tablets and smart phones) to test at home, but not computer equipment generally. (Shann Dep. III at 629:4-9). Even when Enterprise Team members removed mobile devices, they did so for the purpose of "test[ing] something specific." (Morici Dep. 31:22-32:1). Shann, however, testified that when he brought the equipment home on August 16, 2011, he was not working on any specific project. (Shann Dep. II at 299:12-14). And Pierce confirmed that Shann did not need all the equipment he took home to work on any specific project. (Pierce Dep. I at 133:13-22).

Shann also implies he had Atlantic Health authorization to remove the equipment based on McKenna's testimony that Enterprise Team members are "permitted to remove equipment asset tagged to them." (Opp. Br. at 16 (citing Pl. CSMF ¶ 2(g)). But Shann's broad assertion is again unsupported by the record. (*See* Shann Dep. III at 629:4-9). McKenna's testimony referred to laptops—not that Atlantic Health permitted employees to take home *any* computer equipment asset tagged to them. (*See* McKenna Dep. at 83:8-84:70). So, Shann has failed to point the Court to evidence to raise a genuine issue of material fact as to whether he was authorized to remove computer equipment. (*See* Opp. Br. at 15). Put differently, Shann has failed to meet his burden of showing a pretext. *Fuentes*, 32 F.3d at 765.

### 2. *Installing Third-Party Software*

Shann has also failed to contradict the core fact that Atlantic Health's assertion that it terminated Shann for the unauthorized installation of third-party software. According to Shann, he was not terminated for the unauthorized installation of third-party software because "there was no protocol or policy concerning [the] use of third-party software" and because another co-worker similarly used third-party software without authorization. (Opp. Br. at 16). Generally, plaintiffs

alleging discrimination may show pretext by pointing to evidence that similarly situated employees violated company policy with no consequence. *See Delli Santi v. CNA Ins. Cos.*, 88 F.3d 192, 203-04 (3d Cir. 1996) (explaining a violation of company policy can constitute pretext for unlawful discrimination if others similarly situated also violated the policy with no adverse consequences). But plaintiffs must also point to evidence indicating that decisionmakers were aware of the violations of company policy. *See Moussa v. Commonwealth of Pa. Dept. of Pub. Welfare*, 289 F. Supp. 2d 639, 652 (W.D. Pa. 2003) (stating that employee who engages in similar conduct, but whose actions are not known to decision makers, cannot serve as comparator).

Here, Pierce testified that he was not aware of Shann's co-workers' use of the third-party software. (Pierce Dep. at 388:21-389:2). Shann has not pointed to any evidence for this Court to infer that the decisionmakers at Atlantic Health had knowledge of other employees using third-party software. Thus, Shann cannot demonstrate pretext by pointing to a co-worker's installation of unauthorized third-party software with no consequence. (*See* Opp. Br. at 16).

Additionally, pointing to the absence of any documented protocol or policy at Atlantic Health on the unauthorized installation of third-party software is not sufficient to demonstrate pretext. Shann has the burden of "point[ing] to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action." *Willis*, 808 F.3d at 644. This Court is "not [a] super-personnel department tasked with correcting unduly harsh employment actions; we are instead concerned with the whether the reasons for such actions are pretextual." *Klimek v. United Steelworkers Local 397*, 618 F. App'x 77, 80 (3d Cir. 2015). Since Shann has failed to show that his termination for the unauthorized installation of third-party software "was so plainly wrong that it cannot have been the employer's real reason," he has failed to demonstrate that his

termination for the unauthorized use of third-party software was pretextual. *Jones*, 198 F.3d at 413.

Lastly, Shann argues that he "was not terminated for running CCleaner"—the unauthorized third-party software—and deleting 27,000 files. (Opp. Br. at 17). Shann attempts to show pretext because CCleaner was "commonly used" at Atlantic Health and that he was previously asked to test the software. (*Id.*). These arguments fail for two reasons. First, Shann does not dispute that he actually deleted the 27,000 files. (Defs. SMF ¶ 88; D.E. No. 106-1, ("Pl. RSMF") ¶ 88). Second, although Shann asserts that "CCleaner was commonly used" at Atlantic Health, his citation to the record provides no support for this proposition. (Opp. Br. at 17; *see* Pl. RSMF ¶ 72(b)). The record cited only contains discussions from Shann about his own allegations of pretext—nothing more. (*See* Pl. RSMF ¶ 72(b) ("Many other employees at Atlantic Health utilized CCleaner. . . ." (citing Shann Dep. II at 353:23-354:9, 449:3-9))).[7]

For these reasons the Court finds that Shann has failed to "present evidence contradicting the core facts put forward by the [Atlantic Health] as a legitimate reason for its decision." *Kautz*, 412 F.3d at 467. Accordingly, Shann cannot demonstrate pretext under this first method.

***Second Method of Proving Pretext.*** A plaintiff may also show pretext by "point[ing] to evidence that would allow a factfinder to believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Willis*, 808 F.3d at 645. To prove this, a "plaintiff may show that the employer has previously discriminated against [the plaintiff], that the employer has previously discriminated against other persons within the plaintiff's protected class, or that the employer has treated more favorably similarly situated

---

[7] Although Shann claims an employee asked him to "test" the functionality of CCleaner, Pierce testified that, to his knowledge, CCleaner was not submitted to the Enterprise Team for testing and that there is a formal on-boarding process for any new organizational software starting with an application request form. (*See* Pierce Dep. at 122:5-123:5).

persons not within the protected class." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir. 1998). Importantly, a "plaintiff must point to evidence with sufficient probative force that a fact finder could conclude by a preponderance of the evidence that [the plaintiff's disability] was a motivating or determinative factor in the employment decision." *Id.*

Shann does not appear to argue that Atlantic Health previously discriminated against him, that Atlantic Health previously discriminated against other persons with a disability, or that Atlantic Health treated more favorably persons without a disability. Instead, Shann contends that an invidious discriminatory reason was more likely the reason for his termination because (1) Pierce "engaged in conduct demonstrating his discriminatory animus toward Plaintiff's disability," and (2) Pierce was a "key decision-maker" in Atlantic Health's decision to terminate Shann. (Opp. Br. at 17). Shann relies on *Robinson v. Southeastern Pennsylvania Transportation Authority* for the proposition that "an employee can [] show that an employer acted for invidious discriminatory reasons with evidence suggesting discriminatory animus was borne by decision-makers." (*Id.* at 14). In *Robinson*, however, the Third Circuit examined "whether there [was] sufficient evidence to support the trial judge's conclusion that" a series of adverse actions taken against the plaintiff were "casually linked" to his termination. *Robinson v. Southeastern Pennsylvania Transportation Authority*, 982 F.2d 892, 895 (3d Cir. 1993) (holding that an intervening pattern of antagonism is typically needed when temporal proximity is lacking in a retaliation action). Nowhere in *Robinson* does the Third Circuit address—as Shann asserts—whether "[a]n employee can [] show that an employer acted for invidious discriminatory reasons with evidence suggesting discriminatory animus was borne by decision-makers." (Opp. Br. at 14).

Although Shann appears to make the argument that Pierce's discriminatory animus *caused* Atlantic Health to terminate him, Shann provides no citations to the record for the Court to infer

such a causal nexus. Indeed, Shann provides no record citation to support the proposition that Pierce was a "key decision-maker." (*See* Opp. Br. at 17). And, the Court's independent review of the record suggests that the decision to terminate Shann was a "collaborative approach" of various departments at Atlantic Health. (D.E. No. 101-3 ("Werner-Hopkins Dep.") at 16:5-18). So, although Shann's argument sounds in causation, Shann has not cited relevant law nor facts to support this argument. Without more, Shann has failed to demonstrate pretext under this second method.

Accordingly, the Court will GRANT judgment on Defendant's motion for summary judgment on Shann's disability-discrimination claim.

### B. Count I: Failure to Accommodate

#### i. The Parties' Arguments

In support of their motion for summary judgment on Count I, Defendants first argue that Shann's failure-to-accommodate claim fails because Shann testified that he "did not request telecommuting as a reasonable accommodation." (Mov. Br. at 5). Shann responds that he "alerted his superiors of the need for the reasonable accommodations to his disability"[8] and expressed his desires for a modified work schedule. (Opp. Br. at 7, 11).

Next, Defendants contend that this claim also fails because Shann cannot show that his request to work from home on a designated telecommute day was a reasonable accommodation "when his condition was intermittent, sporadic and unpredictable." (Mov. Br. at 9). Shann maintains that telecommuting was a reasonable accommodation and that, despite his expressed

---

[8] In support of this broad statement, Shann cites to nine pages of facts, almost all of which are irrelevant to determining if Shann made it clear that he sought assistance for his disability. (*See* Opp. Br. at 7 (citing Pl. RSMF ¶¶ 45, 50)).

desire for a "modified work schedule," Pierce failed to engage in any interactive process. (Opp. Br. at 11).

Defendants further argue that Shann's failure-to-accommodate claim fails because granting him an "unpaid leave of absence" for an indeterminate period is not a reasonable accommodation. (Mov. Br. at 11). Shann responds that his request for an unpaid leave of absence was a reasonable accommodation because he "submitted medical documentation with an anticipated return to work date of December 15, 2011." (Opp. Br. at 12).

In Opposition, Shann avers that the Court should deny Defendants' motion for summary judgment on Count I because Defendants failed to offer "lounges with couches and open office space" that would have accommodated Shann's need to lie down. (*Id.* at 8). Defendants respond in two ways: (1) that it is an "unsupported merit whether an employer must provide a lounge to accommodate a disability;" and (2) that Shann's affidavit—where he alleges that Atlantic Health could have provided him with lounges or open office space to lie down—"has no bearing on the circumstances . . . in 2011, and does not, as a matter of law, create a disputed material fact." (Reply Br. at 6). The Court addresses these arguments in turn.

### ii.    Analysis

"The failure to accommodate is one of two distinct categories of disability discrimination claims; the other claim being disparate treatment discrimination . . . ." *Tynan v. Vicinage 13*, 351 N.J. Super. 385, 400-01 (App. Div. 2002). Under NJLAD, an employer must make reasonable accommodations "to the limitations of an employee or applicant who is a person with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship." 13 N.J.A.C. § 13-2.5. When an employee requests an accommodation for a disability, the

employer has a responsibility "to engage the employee in the interactive process of finding accommodations." *Bertolotti v. AutoZone, Inc.*, 132 F. Supp. 3d 590, 602 (D.N.J. 2015).

To establish a failure-to-accommodate claim, Shann must establish the following elements: "(1) [he] was disabled and [his] employer knew it; (2) [he] requested an accommodation or assistance; (3) [his] employer did not make a good faith effort to assist; and (4) [he] could have been reasonably accommodated." *Id.* at 601-02.

"If there is a claim that the employer failed to engage in an interactive process concerning accommodation," a plaintiff must establish several elements that go to the second factor of the failure-to-accommodate claim. *Linton v. L'Oreal USA*, No. 06-5080, 2009 WL 838766 (D.N.J. Mar. 27, 2009). Specifically, the Plaintiff must show that: "(1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been accommodated but for the employer's lack of good faith." *Boles v. Wal-Mart Stores, Inc.*, No. 12-1762, 2014 WL 1266216, at *12 (D.N.J. Mar. 26, 2014) (quoting *Tynan v. Vicinage 13*, 351 N.J. Super. 385, 400-01 (App. Div. 2002)); *see also Fulton v. Johnson & Johnson*, No. 05-819, 2008 WL 544668, at *14 n.13 (D.N.J. Feb. 26, 2008) ("[S]tandards for both a prima facie case and the interactive process are virtually identical under both the ADA and the NJLAD.").

***Interactive Process.*** Defendants argue that Shann's interactive process fails because he failed to "request[] accommodations or assistance for [his] disability." (*See* Mov. Br. at 4-5 (citing *Boles*, 2014 WL 1266216, at *12). Specifically, according to Defendants, no genuine issue of material fact exists regarding whether Shann "requested accommodations or assistance for [his]

disability" because Shann never requested to telecommute. (*See* Mov. Br. at 4-5 (citing *Boles*, 2014 WL 1266216, at \*12)). The Court disagrees.

The record demonstrates that Shann did sufficiently advise Defendants of need for assistance to accommodate his disability. (*See* Mov. Br. at 5). On January 21, 2011, Shann sent an email to Pierce explaining his health issues. (*See* D.E. No. 109, Ex. O). In that email, Shann also stated that he wanted "to discuss a temporary modified work arrangement" because it was his "goal was to return to work." (*Id.*). These statements are sufficient to put Defendants on notice of Shann's disability and his desire for assistance. *See Armstrong v. Burdette Tomlin Mem. Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006) (noting that employee requested an accommodation when she "made her handicap known and announced her desire for assistance"). Thus, the Court finds that a genuine issue of material fact exists regarding whether Shann "requested accommodations or assistance for [his] disability." *Boles*, 2014 WL 1266216, at \*12.

Defendants' argument that Shann did not request an accommodation because he did not specifically request telecommuting is unavailing. (*See* Mov. Br. at 7). While Shann does have a duty to "initiate a request for an accommodation," *Fitzgerald v. Shore Memorial Hosp*., 92 F. Supp. 3d 214, 238 (D.N.J. 2015), he is not required to specifically request telecommuting or identify any other accommodation he seeks. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 315 (3d Cir. 1999) (holding that an employee does not bear the burden to propose specific accommodations). Thus, contrary to Defendants' assertions, Shann's interactive-process claim does not fail because he did not specifically request a telecommute day as a reasonable accommodation.[9]

---

[9] In addition to misunderstanding Shann's duty here, Defendants also argue that Shann cannot meet the second element of his interactive-process claim because "the record is void of any rational basis or medical documentation to support the notion that" a telecommute day would alleviate Shann's symptoms. (Mov. Br. at 5). However, whether

Accordingly, the Court will deny Defendants' motion for summary judgment on Shann's interactive-process claim because Shann has demonstrated that a reasonable trier of fact could find that he put Defendants on notice of his disability and of his desire for assistance.

**_Reasonable Accommodations._**  Notwithstanding the above, Defendants argue that Shann's failure-to-accommodate claim fails because neither a telecommute day, an indefinite leave of absence, nor a lounge area were reasonable accommodations.  (Mov. Br. at 6-12; Reply Br. at 5-6).

According to Defendants, providing Shann with a telecommute day was an unreasonable accommodation.  (*See* Mov. Br. at 7).  Defendants reason that, since Shann's position required "teamwork and interaction with other team members and customers and vendors, especially given the [Enterprise Team's] uncharacteristically heavy workload in 2011," a telecommute day was an unreasonable accommodation.  (*Id.* at 9-10).  In essence, Defendants' argument is that a telecommute day was an unreasonable accommodation because Shann's regular attendance "[was] an essential requirement of" his position.  (*Id.* at 7).

As a threshold matter, the Court notes, "[a]n employer's duty to accommodate extends only so far as necessary to allow a disabled employee to perform the essential functions of his job." *Tynan*, 351 N.J. Super. at 397.  However, while AHS had a duty under the LAD to offer a reasonable accommodation, this duty does not "cloak the disabled employee with the right to demand a particular accommodation." *Victor*, 203 N.J. at 424.  New Jersey regulations provide that "[a]n employer must make a reasonable accommodation to the limitations of an employee . . . who is a person with a disability, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business."  13 N.J.A.C. 13:13-2.5.

---

an allegedly proposed accommodation is reasonable is irrelevant to this Court's determination of whether Shann "requested accommodations or assistance for [his] disability."  *Boles*, 2014 WL 1266216, at *12.

Notably, "whether an employer has failed to make reasonable accommodation will be made on a case-by-case basis." *Id.*

To that end, although courts have held "that reasonably regular, reliable, and predictable attendance is a necessary element of most jobs," *Svarnas v. AT & T Commc'ns*, 326 N.J. Super. 59, 78 (App. Div. 1999), courts first determine whether the "nature" of the job itself requires physical attendance to perform the essential functions of the position. *See Miller v. Univ. of Pittsburgh Med. Ctr.*, 350 F. App'x 727, 729 (3d Cir. 2009). For example, in *Miller v. Univ. of Pittsburgh Medical Center*, the Third Circuit found that the plaintiff's position—an emergency room technician who "assist[ed] during surgery performed in the hospital"—required attendance as "an essential element of his position." *Id.*; *see also Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (finding attendance essential for a neo-natal nurse).

Similarly, in *EEOC v. Ford Motor Co.*, the Sixth Circuit considered whether "regular and predictable on-site attendance" was an essential function of a resale buyer's position. 782 F.3d 753, 763 (6th Cir. 2015). The Sixth Circuit found that regular on-site attendance was an essential function of the resale buyer's position because it "required teamwork, meetings with suppliers and stampers, and onsite availability to participate in . . . face-to-face interactions." *Id.* Other courts have similarly examined whether teamwork or face-to-face interaction with clients and other employees were essential functions of a plaintiff's position. *See Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) (finding attendance essential for a loan review analyst working on commercial portfolio team); *see also Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442 (8th Cir. 1998) (finding that attendance was essential for an airline customer service agent).

Thus, the Court must determine whether a reasonable trier of fact could find that a telecommute day would have prevented Shann from performing the essential functions of his

position. The parties generally agree on the essential functions of Shann's position. (*See* Defs. SMF ¶¶ 11-17; Pl. RSMF ¶¶ 11-17). The parties disagree, however, on whether "in-office presence was more conducive to" Shann's ability to provide Enterprise Team members and others with guidance. (Defs. SMF ¶ 15; Pl. RSMF ¶ 15). To dispute this, the only fact Shann cites that is supported by the record is that he could—and previously did—perform his job from home. (Pl. RSMF ¶ 15(b)).

The Court finds that a genuine issue of material exists regarding whether Shann could perform the essential functions of his position with a telecommute day. Before Pierce revoked his telecommute day, Shann had telecommuted since at least 2006. (Defs. SMF ¶ 40; Pl. RSMF ¶ 40). To that end, Defendants have not pointed to evidence indicating that Shann's previous telecommuting prevented him from performing the essential functions of his position. In fact, when Pierce revoked Shann's telecommute day, Pierce had no "performance-related issues" with Shann. (Pierce Dep. I at 106:4-10). Although the Court recognizes that 2011 was a busy year for Atlantic Health, whether the workload was such that Shann's physical presence was required is for a jury to decide. Providing Shann all reasonable inferences, a trier of fact could find that a telecommute day was not an undue burden to Atlantic Health and that Shann could perform all the essential functions of his position with a telecommute day.

Next, Shann's failure-to-accommodate claim regarding AHS's failure to provide an "unpaid leave of absence" for a "short, and reasonable duration" fails as a matter of law. Under New Jersey law, a reasonable accommodation may take the form of a temporary leave of absence. *See* N.J. Admin. Code 13:13-2.5(b)(1)(ii). However, "an indefinite unpaid leave is not a reasonable accommodation, especially where the employee fails to present evidence of the expected duration of her impairment." *Svarnas*, 326 N.J. Super. at 79; *see Krensavage v. Bayer*

*Corp.*, 314 F. App'x 421, 426 n.1 (3d Cir. 2008) (stating that "where the plaintiff does not present evidence of the expected duration of her impairment," an open-ended disability leave is not a reasonable accommodation under the ADA).

Here, Shann's August 17, 2011 leave-of-absence request was not a reasonable accommodation because the record indicates that it was for an undetermined duration. Not only did Shann testify that he was seeking an indefinite leave of absence (Shann Dep. II at 446:12-19), all the documents he submitted requesting a leave of absence do not provide an expected date of return. (*See* D.E. No. 108, Exs. 35 & 36). In contrast to his previous FMLA leave request, where his doctors specified an expected date of return (*see* D.E. No. 108, Exs. 26 & 27), Shann's doctor noted that his estimated date of return was "uncertain."[10]

Lastly, Shann argues that a genuine issue of material fact exists regarding whether Atlantic Health could have provided Shann with a place to lie down because "there were lounges with couches and open office space that would have allowed for this." (Opp. Br. at 8). In support, Shann provides a certification he filed with his Opposition. (*See* D.E. No. 101-6, Ex. Z ("Shann Cert.")). In their Reply, Defendants argue that the Court should disregard this "sham affidavit" because it has "no bearing on the circumstances before Mr. Pierce and [Atlantic Health] in 2011, and does not, as a matter of law, create a disputed material fact." (Reply Br. at 6). The Court disagrees.

---

[10]    Shann claims that, "[o]n August 21, 2011, Plaintiff submitted medical documentation with an anticipated return to work date of December 14, 2011." (Opp. Br. at 12). In support of this proposition, Shann cites only to his deposition testimony. (*See* Shann Dep. I at 186:10-187:5). Although Shann is questioned on a medical certification that appears to contain a "12/14/2011" date of "recovery" (*id.*), there is no evidence that this medical certification was ever submitted to Atlantic Health. Moreover, it also appears that the discussion of this medical certification was in reference to Shann's application for state disability benefits. (*Id.* at 188:7-10). Thus, the Court must reject Shann's claim that he submitted medical documentation to Atlantic Health "with an anticipated return to work date of December 14, 2011" because it is unsupported by the record.

As a threshold matter, Shann's affidavit is not a sham affidavit. "A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment. A sham affidavit cannot raise a genuine issue of fact because it is merely a variance from earlier deposition testimony, and therefore no reasonable jury could rely on it to find for the nonmovant." *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). Courts may disregard an affidavit when the "affiant was carefully questioned on the issue, had access to the relevant information, and provided no satisfactory explanation for the later contradiction." *Martin v. Merrel Dow Pharm., Inc.*, 851 F.2d 703, 705 (3d Cir. 1988). Courts may also disregard an affidavit "entirely unsupported by the record and directly contrary to [other relevant] testimony or if it's clear the affidavit was offered soley to defeat summary judgment." *Daubert v. NRA Group, LLC*, No. 16-3613, 2017 WL 2836808, at *5 (3d Cir. July 3, 2017).

Defendants do not elaborate on why Shann's certification is a "sham affidavit." (*See* Reply Br. at 5-6). They note, however, that Shann's certification does not contradict any *deposition testimony*. (Reply Br. at 5; *see also* Defs. SMF ¶ 45; Pls. SMF ¶ 45). In fact, Shann's certification appears to be at least partly consistent with his deposition testimony. (*See* Shann Dep. III at 693:7-11). Shann's affidavit states that "there were employee lounges with couches, and open offices that could have been utilized to provide [him] with a place to lie down and work (from a laptop), if [his] symptoms became aggravated." (Shann Cert. at 2). Consistent with this statement, when asked if anyone at Atlantic Health offered him a place to lay down during his flare-ups, Shann testified "no." (*Id.*). Defendants have not pointed the Court to any part of Shann's deposition testimony that conflicts with his certification. (*See* Reply Br. at 5-6); *see Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004) (explaining that not all contradictory affidavits are shams and advising

courts to not to disregard affidavits "[w]hen there is independent evidence in the record to bolster an otherwise questionable affidavit").

Moreover, Shann's January 21, 2011 email stating that "lay[ing] down with [his] head elevated" at work was "obviously not something that [he] [could] do at work," is not dispositive of whether Atlantic Health made "reasonable accommodation to [Shann's] limitations." 13 N.J.A.C. 13:13-2.5. With no substantive argument on why providing Shann with an area to lie down was an unreasonable accommodation, Defendants' motion for summary judgment on this ground fails as a matter of law. *See id.* (stating that an employer must provide a reasonable accommodation "unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business").

Accordingly, the Court DENIES Defendants' motion for summary judgment on Shann's failure-to-accommodate claim arising from whether a telecommute day was a reasonable accommodation and whether providing Shann with an area to lie down was reasonable accommodation. However, the Court GRANTS Defendants' motion for summary judgment on Shann's failure-to-accommodate claim arising from whether providing Shann with an indefinite leave of absence on August 17, 2011 was a reasonable accommodation.

### C. Count III: Interference with FMLA Rights

#### i. The Parties' Arguments

Defendants move for summary judgment on Shann's FMLA interference claim. (Mov. Br. at 17-24). Defendants argue that Shann's FMLA interference claim fails as a matter of law because "there is no evidence that anyone ever denied him any request to exercise his FMLA rights." (*Id.* at 18). Thus, according to Defendants, Shann's interference claim fails because Atlantic Health never denied any request for FMLA leave.

Shann does not dispute that Atlantic Health granted both the FMLA leave from December 6, 2010 to January 25, 2011, and intermittent FMLA leave when he returned to work.  (Opp. Br. at 19-22).  Instead, irrespective of Atlantic Health granting him FMLA, Shann argues that genuine issue of material fact exists regarding Defendants' attempts to "dissuade [him] from utilizing FMLA rights." (*Id.* at 21).  In addition to Defendants' attempts to dissuade Shann from taking FMLA leave, Shann also argues that Defendants interfered with his right to take FMLA leave when "Pierce orchestrated the termination" of his employment just as he was set to begin a block leave of absence.  (*Id.* at 22).

### ii.  Analysis

#### a.  Interference with FMLA Rights

The FMLA provides eligible employees "a total of 12 workweeks of leave during any 12-month period" to remedy "a serious health condition that makes the employee unable to perform the functions of the position."  29 U.S.C. § 2612(a)(1)(D).  FMLA even provides qualifying employees FMLA leave to care for a close family member who "has a serious health condition." *Id.* § 2612(a)(1)(C).

The Third Circuit has stated, "employers may not interfere with, restrain, or deny the exercise of or attempt to exercise" FMLA rights.  *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012) (citing 29 U.S.C. § 2615(a)(1)(C)).  "A claim that these rights have been breached is referred to as "interference." *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 245 (3d Cir. 2016).

To establish a claim of interference under the FMLA, Shann must establish: (1) that he was an eligible employee under the FMLA; (2) that Atlantic Health was an employer subject to the FMLA's requirements; (3) that he was entitled to FMLA leave; (4) that he gave notice to

Atlantic Health of his intention to take FMLA leave; and (5) that he was denied benefits to which he was entitled under the FMLA. *See Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014); *see also Sommer v. The Vanguard Grp.*, 461 F.3d 397, 399 (3d Cir. 2006) (explaining that an interference claim requires an employee to show that he was not only entitled to FMLA benefits but that he was denied those benefits).

### b. Shann Cannot Prove Interference with FMLA Rights

According to Defendants, the undisputed material facts demonstrate that Atlantic Health never denied Shann any FMLA leave. (Mov. Br. at 18). Specifically, Defendants note that when Shann requested FMLA leave from December 6, 2010 to January 24, 2011, Atlantic Health granted it. (*Id.*). Moreover, after Shann returned to work in January 2011, Atlantic Health granted him intermittent FMLA leave. (*Id.* at 18). Lastly, Defendants also note that, even if the Court considers Shann's request for FMLA leave shortly before Atlantic Health terminated him, he cannot establish that it "constituted FMLA interference." (Reply Br. at 15). The Court agrees.

No reasonable trier of fact could find that Atlantic Health denied Shann FMLA leave. The parties do not dispute that Shann requested—and Atlantic Health granted—FMLA leave from December 6, 2010 to January 24, 2011. (Defs. SMF ¶¶ 20-21; Pl. RSMF ¶¶ 20-21). Nor do the parties dispute that Shann requested—and Atlantic Health granted—intermittent FMLA leave beginning January 25, 2011. (Defs. SMF ¶¶ 24-25; Pl. RSMF ¶¶ 24-25). Moreover, the parties do not dispute that Shann testified that neither Pierce nor anyone else at AHS interfered with his FMLA intermittent leave. (Defs. SMF ¶ 43; Pl. RSMF ¶ 43; Shann. Dep. II. at 388:10-25). Thus, when Shann requested FMLA leave, Atlantic Health granted his request, and Shann took his leave.

Notwithstanding the undisputed record, Shann insists that he can make out an FMLA-interference claim because Defendants discouraged or dissuaded him from taking FMLA leave.

(Opp. Br. at 20-21 (citing *Shtab v. The Greate Hotel & Casino, Inc.*, 173 F. Supp. 2d 255, 258-59, 268-69 (D.N.J. 2001)).  According to Shann, Pierce interfered with his FMLA rights because Pierce tried "[t]o dissuade [him] from utilizing FMLA rights" by "engag[ing] in temporally suggestive punitive actions."  (*Id.*).  Specifically, Shann notes that Pierce twice disciplined him for not complying with the dress code soon after returning from FMLA leave and suspended Shann's telecommute day soon after discovering the amount of FMLA days Shann had available.  (*Id.*).

Still, even if the Court assumed that Defendants discouraged or dissuaded Shann from exercising his FMLA rights—and ignored his testimony to the contrary (*see* Shann. Dep. II. at 388:10-25)—his FMLA interference claim still fails.  Shann is correct to note that some courts have suggested that plaintiffs who take FMLA leave may still maintain an interference claim for actions that could "chill" their desire to take FMLA leave.  *See Shtab*, 173 F. Supp. 2d at 267-68 (before taking FMLA leave employee was asked to delay leave); *see also Williams v. Shenango, Inc.*, 986 F. Supp. 309, 320-21 (W.D. Pa. 1997) (employee was asked to reschedule FMLA leave).  The Court, however, finds more recent Third Circuit precedent more persuasive.

The Third Circuit has unequivocally stated that "for an interference claim to be viable, the plaintiff must show that FMLA benefits were actually withheld."  *Ross*, 755 F.3d at 191-92; *see also Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 143 (3d Cir. 2004) (stating FMLA interference claim entails proof that employer made employee "unable to exercise that right in a meaningful way, *thereby causing injury*").  Indeed, when the Third Circuit considered *Shtab*, it explained that actions that may discourage an employee from taking FMLA leave "must occur in tandem with actual harm."  *Fraternal Order of Police*, 842 F.3d at 246.  Thus, Shann must show that Atlantic Health denied him FMLA benefits.  *See Callison v. City of Phila.*, 430 F.3d 117, 119

(3d Cir. 2005) ("An interference action is . . . only about whether the employer provided the employee with entitlements guaranteed by the FMLA.").

The undisputed record demonstrates that Shann received FMLA benefits. Since Shann cannot "show that FMLA benefits were actually withheld," his FMLA interference claim fails as a matter of law. *See Griffith v. PNC Bank*, No. 13-5407, 2015 WL 2400222, at *13 (D.N.J. May 20, 2015) (stating that if a plaintiff seeks to show interference by way of discouragement, "she must show not only that a violation occurred, but that she suffered prejudice thereby").

Accordingly, the Court will GRANT Defendants' motion for summary judgment on Shann's FMLA interference claim.[11]

### D. Count III: Retaliation for Use of FMLA Rights

#### i. The Parties' Arguments

Defendants contend that Shann's FMLA retaliation claim fails as a matter of law. (Mov. Br. at 18-24). According to Defendants, Shann's allegation that Pierce revoked his telecommuting day in response to Shann using FMLA leave fails because it did not cause a "significant change in employment status." (*Id.* at 21). Additionally, Defendants aver that, "a reasonable employee would not be dissuaded from asserting his FMLA rights as a result of Pierce's revocation of Shann's telecommuting day" because he "continued to take intermittent FMLA leave after his telecommute day was revoked." (*Id.*). In response to both arguments, Shann submits that a genuine issue of material fact exists because a "jury could reasonably conclude that the revocation of [his] telecommuting day was a materially adverse action that would have dissuaded a reasonable person from utilizing FMLA rights." (Opp. Br. at 25).

---

[11] Although Shann also alleges that Defendants interfered with his FMLA rights by terminating his employment, this claim "is more properly brought as a retaliation claim, not an interference claim." *Capps v. Mondelez Global LLC*, 147 F. Supp. 3d 327, 336 (E.D. Pa. 2015); *see also Stephenson v. JLG Indus., Inc.*, No.09-1643, 2011 WL 1304625, at *5 (M.D. Pa. Mar. 31, 2011).

Defendants also argue that Shann's claim of FMLA retaliation arising from his termination fails as a matter of law. (Mov. Br. at 23). According to Defendants, the undisputed material facts demonstrate that Shann cannot "point to evidence sufficient to create an inference that a causative link exists between [his] FMLA leave and [his] termination." (*Id.*). Defendants also note that Shann cannot demonstrate pretext because Shann's termination was the result of his removal of "a substantial amount of equipment . . . without the knowledge or authority of AHS management." (*Id.*).

Shann counters that he can "easily establish the causal link" because the record indicates a "clear temporal proximity between" him requesting FMLA leave and the termination of his employment. (Opp. Br. at 26). Shann also contends that there is "ample evidence of pretext calling into question the reasons advanced by Defendants' [sic] for terminating Plaintiff's employment and supporting a conclusion that Defendants were motivated by discriminatory intent in the termination." (*Id.* at 28).

### ii. Analysis

#### a. Retaliation for Use of FMLA Rights

FMLA regulations created FMLA retaliation claims. *See* 29 C.F.R. § 825.220(c). FMLA regulations prohibit employers from "discriminating or retaliating against an employee or prospective employee for having exercised or attempted to exercise FMLA rights." *Id.* To establish a FMLA retaliation claim, Shann must prove that "(1) he invoked [his] right to FMLA-qualifying leave, (2) [he] suffered an adverse employment decision, and (3) the adverse action was causally related to [his] invocation of rights." *Lichtenstein*, 691 F.3d at 302.

Importantly, unlike FMLA interference claims, "FMLA retaliation claims require proof of the employer's retaliatory intent," requiring courts to assess "these claims through the lens of

employment discrimination law." *Id.* Accordingly, FMLA retaliation claims based on circumstantial evidence are governed by the burden-shifting framework established by *McDonnell Douglas*. *See id.*

Since Shann's claim is based on circumstantial evidence, he has the burden of establishing that (1) he invoked his right to FMLA-qualifying leave; (2) he suffered an adverse employment decision; and (3) the adverse action was causally related to his invocation of rights. *Id.* Once Shann "establishes a prima facie case, the burden shifts to [Atlantic Health] to provide evidence of a legitimate non-discriminatory reason for the adverse action." *Budhun v. Reading Hosp. and Medical Center*, 765 F.3d 245, 256 (3d Cir. 2014). If Atlantic Health meets this minimal burden, then the burden shifts to Shann, requiring him to "point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve [Atlantic Health's] articulated legitimate reasons." *Fuentes*, 32 F.3d at 764.

### b. Shann May Prove Retaliation Based On Revocation of Telecommuting Privilege

Regarding the revocation of his telecommute day, Defendants argue that Shann cannot meet the second element of his FMLA retaliation claim. According to Defendants, no reasonable trier of fact could find that the revocation of Shann's telecommute day sufficiently constituted an "adverse employment decision" because he was not fired, he was not given different responsibilities, and he did not experience a significant change in benefits. (*See* Mov. Br. at 19-22). In other words, since "[t]he revocation of Shann's telecommute day did not result in any significant change in employment status," his corresponding FMLA retaliation claim fails as a matter of law.

Although Shann appears to concede that the revocation of his telecommute day does not cross the threshold to "alter[] [his] compensations, terms, conditions, or privileges of

employment," he argues that the Court should apply a different standard to analyze his retaliation claim. (Opp Br. at 24). According to Shann, whether the revocation of his telecommute day constitutes "retaliation" should be analyzed pursuant to the Supreme Court's standard of retaliatory actions in the Title VII context. (*Id.* (citing *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). This Court agrees.

In the FMLA retaliation context, the Third Circuit has held that an adverse employment action "alters the employee's compensation terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Budhun*, 765 F.3d at 257. In contrast, in the Title VII context the Supreme Court has applied a "materially adverse" standard to retaliatory actions. *Burlington Northern*, 548 U.S. at 57. In Title VII retaliatory actions, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, such that the action well might have dissuaded a reasonable worker from taking a protected action." *Id.*

"While the Third Circuit has never squarely held that this 'materially adverse' standard applies in the context of an FMLA retaliation claim, it has suggested that, were it necessary to address the issue, it would so hold."[12] *Incorvati v. Best Buy Co.*, 2013 WL 3283956, at *4 n.5 (D.N.J. June 27, 2013) (citing *Kasper v. County of Bucks*, No. 12-2504, 2013 WL 563342, at *5 (3d Cir. Feb. 15, 2013)); *see also DiCampli v. Korman Communities*, 257 F. App'x 497, 501 (3d Cir. 2007) (applying "materially adverse" standard to an FMLA claim without further discussion).

---

[12] At least five other U.S. Courts of Appeals that have addressed this issue have held the "materially adverse" standard applies to FMLA retaliation claims. *See, e.g.*, *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) (requiring adverse action giving rise to FMLA retaliation claim to be "materially adverse"); *McArdle v. Dell Prods., L.P.*, 293 F. App'x 331, 337 (5th Cir. 2008) (same); (*Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 n.2 (10th Cir. 2006) (same).

Accordingly, the Court will analyze Shann's retaliation claim under the "materially adverse" standard.

So, the Court must determine whether a reasonable employee would have found the revocation of Shann's telecommute day "materially adverse in that it well might have dissuaded a reasonable worker from exercising a right under the FMLA." *DiCampli*, 257 F. App'x at 501. The Court must consider the revocation of Shann's telecommute day objectively, based on how a reasonable employee may react, and the context in which the telecommute day was revoked. *Burlington Northern*, 548 U.S. at 68-69 (explaining that employer actions should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances).

Here, a genuine issue of material fact exists regarding whether the revocation of Shann's telecommute day "might have dissuaded a reasonable worker from exercising a right under the FMLA." *DiCampli*, 257 F. App'x at 501. Pierce informed Shann that he was revoking his telecommute day "[i]n order to honor [his] intermittent leave." (Defs. SMF ¶¶ 36). Pierce's reference to Shann's intermittent leave when revoking his telecommuting privilege is troubling. Providing all reasonable inferences in Shann's favor, a trier of fact may find that Pierce revoked the telecommuting privilege because Shann was using FMLA intermittent leave. Indeed, if a trier of fact finds that Pierce revoked Shann's telecommuting privilege because he was using FMLA intermittent leave, then a trier of fact could find that this "might [] dissuade[] a reasonable worker from exercising a right under the FMLA." *DiCampli*, 257 F. App'x at 501.

Of course, it is not lost on the Court that facts in the record may mitigate the impression a reasonable worker may get from the revocation of a telecommuting privilege. For example, the Telecommuting Agreement between Atlantic Health and Shann states that Atlantic Health may terminate the agreement at any time. (Defs. SMF ¶ 40). Supplements to this Telecommuting

Agreement also indicate that an employee's ability to telecommute is subject to the needs of Atlantic Health. (*See* Defs. SMF ¶¶ 41, 42; Pl. RSMF ¶¶ 41, 42). Consistent with these qualifications to the Telecommuting Agreement, Pierce's email revoking Shann's telecommute day cited "the extremely busy" year Atlantic Health was experiencing. (Defs. SMF ¶ 36; Pl. RSMF ¶ 36). Shann even agrees that 2011 was an extremely busy year for Atlantic Health. (Shann. Dep. II at 391:22-393:24).

Moreover, the Court is aware that, despite the revocation of his telecommute day, Shann took an additional 87 hours of FMLA intermittent leave. (Defs. SMF ¶ 27; Pl. RSMF ¶ 27). Indeed, "context matters such that an act that would be immaterial in some situations is material in others." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 196 (3d Cir. 2015). Notwithstanding the above, it is for a jury to weigh the evidence and assess witnesses' credibility to determine whether, in this context, Pierce's email "might have dissuaded a reasonable worker from exercising a right under the FMLA." *DiCampli*, 257 F. App'x at 501.

Defendants make two arguments that the Court must reject. First, Defendants argue that revoking Shann's telecommuting privilege does not constitute an "adverse employment action" because it was "not a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." (Mov. Br. at 21-22). As explained above, however, this is not the appropriate standard in this context. In the FMLA retaliation context, an "adverse action" means an action that is "materially adverse in that it well might have dissuaded a reasonable worker from exercising a right under the FMLA." *DiCampli*, 257 F. App'x at 501.

Second, to the extent Defendants ask the Court to hold that revocation of a telecommuting privilege is *per se* not "materially adverse," the Court declines to do so. While courts have held

that the revocation or denial of a request to telecommute does not constitute an action that is materially adverse to dissuade plaintiffs from asserting their FMLA rights,[13] the Court is also mindful of the Supreme Court's instructions. Specifically, the Supreme Court has explained that "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington Northern*, 548 U.S. 53 at 68 (stating that the "materially adverse" standard speaks in general terms rather than to specific prohibited acts). Thus, the Court refuses to find that the revocation of Shann's telecommuting privilege in this context is *per se* not materially adverse because "an act that would be immaterial in some situations is material in others." *Id.*

Accordingly, the Court DENIES Defendants' motion for summary judgment on Shann's FMLA retaliation claim arising from the revocation of his telecommute day.

### c. Shann FMLA-Retaliation Claim Based On Termination

Defendants argue that Shann's claim of FMLA retaliation arising from his termination fails as a matter of law. (Mov. Br. at 23). According to Defendants, the undisputed material facts demonstrate that Shann cannot "point to evidence sufficient to create an inference that a causative link exists between [his] FMLA leave and [his] termination." (*Id.*). Shann states that he can "easily establish the causal link" because the record indicates a "clear temporal proximity between" him requesting FMLA leave and the termination of his employment. (Opp. Br. at 26). Thus, at the *prima facie* stage, it seems that the parties dispute only the causation element.

The Court must decide whether there is a genuine issue of material fact that Shann's termination is causally related to his request for FMLA leave. To establish causation at the *prima*

---

[13]    *See, e.g.*, *Weil v. CareCore Nat'l, LLC*, 833 F. Supp. 1289, 1298 (D. Colo. 2011) (holding that revocation of telecommute day was not a materially adverse employment action); *Lewis v. CareCore Nat'l, LLC*, 2012 WL 3704985, at *9 (D. Colo. May 30, 2012) (holding that failure to assign the plaintiff to telecommute from home was not an adverse employment action).

*facie* stage, Shann must "point to evidence sufficient to create an inference that a causative link exists" between his engagement in protected activity and his termination. *Lichtenstein*, 691 F.3d at 307. The Third Circuit has instructed that in determining whether a causal link exists between the protected activities and a plaintiff's termination, courts should turn "a careful eye to the specific facts and circumstances encountered." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 n.5 (3d Cir. 2000). "To demonstrate a causal connection, a plaintiff generally must show either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Budhun*, 765 F.3d at 258. Although courts are "reluctant to infer a causal connection based on temporal proximity alone," the standard for "unusually suggestive" temporal proximity at the prima facie stage is not a high one. *Id.*

Here, the Court finds that Shann has met his burden of establishing genuine issues of material facts as to causation. Between August 15 and August 17, 2011, Shann informed Atlantic Health Human Resources, Pierce, and McKenna of his intention to take FMLA leave. (Defs. SMF ¶¶ 34, 62-63). Approximately one week later, Atlantic Health terminated Shann. (*Id.* ¶ 5). Thus, the temporal proximity of Shann's request for FMLA leave and his termination is sufficient to meet the causation element at this stage. *See Budhun*, 765 F.3d at 258 (finding employer's termination of plaintiff less than a week after plaintiff invoked her right to FMLA leave constituted sufficiently close temporal proximity to qualify as unusually suggestive timing); *see also Lichtenstein*, 691 F.3d at 307 (determining that termination less than a week after the plaintiff invoked her right to FMLA leave established causation).

Next, Defendants argue that, even if Shann can establish a *prima facie* case for FMLA retaliation, he cannot demonstrate pretext. (Mov. Br. at 24). According to Defendants, Shann

cannot demonstrate pretext because his termination was the result of his removal of "a substantial amount of equipment . . . without the knowledge or authority of Atlantic Health management." (*Id.* at 24). Shann maintains that there is "ample evidence of pretext calling into question the reasons advanced by Defendants' [sic] for the terminat[ion] of [his] employment." (Opp. Br. at 28).

At this stage, however, the parties put forth the same arguments and evidence they did at the pretext stage of Shann's disability-discrimination claim. As explained above, Shann has failed to demonstrate pretext under both methods. *See supra* at 16-24. Thus, Shann's FMLA-retaliation claim arising from his termination fails as a matter of law.

Accordingly, the Court GRANTS judgment on Defendants' motion for summary judgment on Shann's FMLA-retaliation claim arising from his termination.

### E. Count IV: Defamation—Slander Per Se

In Count IV, Shann alleges that Pierce "published defamatory statements to others." (Compl. ¶ 54). Specfically, Shann alleges that Pierce made defamatory statements to Shann's former co-workers, law enforcement officers, and two individuals at "Computer Discount Warehouse." (Opp. Br. at 34-36).

#### i. The Parties' Arguments

Pierce makes two arguments in support of his motion for summary judgment on Count IV. First, Pierce argues that there is no evidence of "any statement made by the Defendants that could possibly be considered 'false.'" (Mov. Br. at 30). According to Pierce, the individuals identified by Shann as having heard Pierce's defamatory statements did not "recall ever being told by Defendants that [Shann] had been stealing, or that he had been terminated for suspected theft." (*Id.*). In fact, according to Pierce, "to the extent that these individuals learned the details of

[Shann's] suspected criminal conduct, each of them testified that they learned about the accusation from [Shann] himself." (*Id.*). Shann does not refute this argument. (*See* Opp. Br. at 34-37).

Next, Pierce contends that any statements he made about Shann's alleged theft are subject to qualified privilege because probable cause existed and he had a bona fide interest in informing the police. (Mov. Br. at 33-35). Shann counters that Pierce cannot get the benefit of qualified privilege because he knew that the statements he made were "either knowingly false or made in reckless disregard for the truth." (Opp. Br. at 36).

### ii. Analysis

"In any defamation action, the plaintiff bears the burden of establishing, in addition to damages, that the defendant (1) made a defamatory statement of fact (2) concerning the plaintiff (3) which was false, and (4) which was communicated to a person or persons other than the plaintiff." *Trawinski v. Doe*, No. 0312-14, 2015 WL 3476553, at *4 (N.J. Super. Ct. App. Div. June 3, 2015). A plaintiff must also demonstrate that the statements were made with "a sufficient degree of fault." *Mangan v. Corporate Synergies Grp, Inc.*, 834 F. Supp. 2d 199, 204 (D.N.J. 2011). Here, the parties disagree on whether Pierce uttered any "false statements," and, if so, whether those statements are subject to qualified privilege.

The Court finds that Shann's defamation claim arising from statements Pierce allegedly made to Shann's former co-workers fails as a matter of law. The record contains no support for Shann's assertion that "Pierce informed [his] co-workers that he stole items and was arrested in his home." (Opp. Br. at 36). It is undisputed that none of Shann's co-workers testified that Defendants informed them that he stole items or that the police arrested Shann in his home. (*See* Defs. SMF ¶¶ 98-107; Pl. RSMF ¶¶ 98-107). Moreover, Shann's co-workers testified that Shann—

not Defendants—informed them that Shann was suspected of stealing computer equipment and that the police were at his home to arrest him.  (Defs. SMF ¶¶ 99, 105, & 107).

The only evidence Shann cites in support of this allegation is his own testimony.  (*See* Opp Br. at 36 (citing Pl. RSMF ¶ 98(a))).  But even Shann's testimony establishes only that his co-workers met with Pierce—not what Pierce said during those meetings.  (*See* Shann Dep. at 97:12-98:9).  In any event, Shann testified that he explained to his co-workers, before they met with Pierce, "that the police were looking for [him] and what was going on."  (Shann Dep. II at 489:5-490:1).  Thus, Shann's defamation claim arising from statements made to his former co-workers fails as a matter of law.

Regarding any of Pierce's statements made to police, Shann's defamation claim similarly fails because those statements are subject to qualified privilege.  In New Jersey, "citizens have a qualified privilege to make statements to authorities for the prevention and detection of crime."  *Dairy Stores, Inc. v. Sentinal Publ'g Co.*, 104 N.J. 125, 136 (1986).  If a statement is made in good faith to a law enforcement officer to bring a criminal to justice, then the "statement is subject to qualified privilege."  *Dijkstra v. Westerink*, 168 N.J. Super 128, 135 (1979).

A statement is not subject to qualified privilege, however, if the defendant "[1] knows the statement is false or . . . acts in reckless disregard of its truth or falsity; [2] the publication serves a purpose contrary to the interests of qualified privilege; or [3] the statement is excessively published."  *Govito v. W. Jersey Health Sys., Inc.*, 332 N.J. Super 293, 312 (App. Div. 2000).  Moreover, "whether a defamatory statement is privileged is a threshold determination to be made by a judge rather than a jury."  *Flyth v. Ralph Lauren, Inc.*, No. 16-1321, 2016 WL 6806340, at *4 (D.N.J. Nov. 17, 2016).

Pierce's statements to Officer Sutherland fall directly within the ambit of qualified privilege. It is undisputed that when Pierce spoke to Officer Sutherland, he was "aware of reports that Plaintiff intended to leave the facility with equipment and software, take disability leave and not return to [Atlantic Health]." (Mov. Br. at 34 (citing Defs. SMF ¶¶ 58-61); *see also* Pl. RSMF ¶¶ 58-61). Moreover, through Ishaque, Pierce learned that Shann "copied all the Microsoft stuff." (Defs. SMF ¶ 61; Pl. RSMF ¶ 61). Thus, there is not dispute that Pierce's statements were made "in good faith for the purpose of helping to bring a criminal to justice." *Dijkstra*, 168 N.J. Super. at 135.

According to Shann, Pierce's statements to Officer Sutherland are not subject to qualified privilege for two reasons. First, Shann claims that Pierce knowingly lied about Shann's authorization to remove computer equipment on August 16, 2011. (Opp. Br. at 36). However, as explained above, the record does not support the proposition that Atlantic Health authorized Shann to remove computer equipment on August 16, 2011. *See supra* at 18-20. Moreover, Shann fails to cite any evidence in the record supporting the proposition that Pierce knew Atlantic Health authorized him to remove computer equipment on August 16, 2011. (*See* Opp. Br. at 36).

Second, Shann avers that Pierce's statements to Officer Sutherland that Shann stole "Microsoft license keys" were made in reckless disregard for the truth because "there was absolutely no evidence to support the contention that Plaintiff stole Microsoft keys." (Opp. Br. at 36). To establish that Pierce made a statement with reckless disregard for the truth, Shann must show "that [Pierce] made the statement with a high degree of awareness of its probable falsity." *Durando v. Nutley Sun*, 209 N.J. 235, 251 (2012); *see also Govito*, 332 N.J. Super. at 317 ("Reckless disregard as to truth or falsity exists when there is a high degree of awareness of probable falsity or serious doubt as to the truth of the statement."). "The test is subjective, not

objective, and involves analyzing the thought processes of the particular defendant . . . ." *Id.* Importantly, "Plaintiff has the burden of proving an abuse of the privilege by clear and convincing evidence." *Christensen v. Weichert Ins. Agency, Inc.*, No. A-4953-11T2, 2013 WL 6122593, at *5 (N.J. Super. Ct. App. Div. Nov. 22, 2013).

While it is true that it may have been Pierce's idea that Shann stole Microsoft keys, there are not facts to suggest Pierce made this statement with "reckless disregard as to truth or falsity" or that he had "a high degree of awareness of probable falsity or serious doubt to the truth of the statement." *Govito*, 332 N.J. Super. at 317. The undisputed facts establish that Ishaque informed Pierce and Officer Sutherland that Shann "copied all the Microsoft stuff and other things to [a] desktop hard disk." (Defs. SMF ¶ 61). Additionally, Ishaque testified that he told Pierce that he saw Shann downloading "Microsoft software[]" that was "licensed to [Atlantic Health]." (D.E. No. 101-5, ("Ishaque Dep.") at 252:20-25). To that end, Pierce testified "he believed that it was possible that [Microsoft key codes] had left the building." (Pierce Dep. II at 229:12-14). Indeed, Pierce's belief is not without basis: both Shann and Pierce testified that to activate or use Microsoft software after a trial period, a user would be required to enter a Microsoft key. (Pierce Dep. II at 238:2-9; Shann Dep. II at 304:18-23).

Moreover, to the extent Shann argues that the Court should find that Pierce made the statement with "reckless disregard for the truth" because Pierce's statement was—in hindsight— false, the Court disagrees. "Ultimately, the fact that a defamatory statement turns out to be untrue does not remove the protection of the qualified privilege." *Birch v. Wal-Mart Stores, Inc.*, No. 15-1296, 2015 WL 8490938, at *5 (D.N.J. Dec. 9, 2015); *see also Fees v. Trow*, 105 N.J. 330, 338 (1987) ("The purpose of the qualified privilege is to give to the person who utters defamatory words that are in fact untrue protection from legal liability for that defamation if those words are

uttered in furtherance of the policy that the qualified privilege is designed to accommodate."). Thus, Shann has failed to point the Court to evidence from which a reasonable trier of fact could find that Pierce made these statements with a "reckless disregard for the truth."

Lastly, the Court must decide whether a genuine issue of material fact exists regarding whether Pierce defamed Shann when he emailed two individuals at "Computer Discount Warehouse." (Opp. Br. at 36). In the email, Pierce informed the individuals that Atlantic Health "launched an internal investigation to determine if Atlantic Health employee Jason Shann has been operating a side business performing computer support while on Atlantic Health time clock." (D.E. No. 109, Ex. NN). Pierce added that he had "reason to believe that [Shann] has downloaded the Microsoft Product keys and may be using them in a way not consistent with the licensing agreement." (*Id.*). In their Reply, Defendants argue that these statements, "on their face or under the circumstances" are not defamatory. (Reply Br. at 10).

Without more, Defendants have not carried their burden of showing an absence of a genuine issue of material fact. As the moving parties, Defendants "bear[] the burden of identifying specific portions of the record that establish the absence of a genuine issue of material fact." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015). "It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 328 (1986) (White, J., concurring).

Here, to determine whether Pierce's statements are defamatory, the Court must determine whether Pierce's statements are "false and injurious to the reputation of another or exposes another person to hatred, contempt or ridicule or subjects another person to a loss of the good will and confidence" of others. *Romaine v. Kallinger*, 109 N.J. 282, 289 (1988). To that end, the Court

must consider three factors: content, verifiability, and context.[14]  *Lynch v. N.J. Educ. Ass'n*, 161 N.J. 152, 167 (1999).  With just Defendants' conclusory assertion, the Court cannot even begin to conduct this analysis.[15]

Thus, the Court DENIES Defendants' motion for summary judgment on Shann's defamation claim arising from statements made to the two individuals at "Computer Discount Warehouse."   The Court, however, GRANTS Defendants' motion for summary judgment on Shann's defamations arising from statements made to Shann's co-workers and Officer Sutherland.

### F.  Count V: Intentional Infliction of Emotional Distress

#### i.    The Parties' Arguments

Defendants make two arguments in support of their motion for summary judgment on Count V.  (Mov. Br. at 35-38).  First, Defendants argue that the Court should dismiss Count V because Shann "is precluded from obtaining double recovery where the evidence to his emotional injury overlaps or duplicates that proffered to establish his LAD claim."  (*Id.* at 35).  According to Shann, the fact that "he has two different claims seeking emotional distress damages is in no way ground for dismissal for one of the claims."  (Opp. Br. at 38).

Next, Defendants argue that "no facts in the record [] suggest that Defendants either (1) acted outrageously with the intent to cause [Shann] severe emotional distress, or (2) acted recklessly to the high possibility of causing severe emotional distress."  (Mov. Br. at 37).  Shann disagrees, stating that the evidence demonstrates that Pierce fabricated information, misled his

---

[14]      When examining a statement's content, the Court examines its literal meaning and what a reasonable reader would understand the statement to mean.  *Lynch*, 161 N.J. at 167.  When the Court examines the verifiability of a statement, the Court must determine whether the statement can be proved true or false because opinions, which cannot be proven false, are not actionable.  *McLaughlin v. Rosanio, Bailets & Talamo, Inc.*, 331 N.J. Super. 303, 312 (App. Div. 2000).  Statements of opinion, however, are actionable when they imply false underlying objective facts.  *Lynch*, 161 N.J. at 167.  Lastly, the Court inquiries into the context of a statement because it may affect the statement's meaning.  *Id.* at 168.

[15]      Defendants have not made the argument that qualified privilege applies to these statements.

superiors, and lied to law enforcement in order to conceal the discriminatory termination of Shann's employment. (Opp. Br. at 32).

### ii. Analysis

"Intentional infliction of emotional distress [("IIED")] consists of extreme and outrageous conduct which intentionally or recklessly causes severe emotional distress to another." *Ramirez v. U.S.*, 998 F. Supp. 425, 434 (D.N.J. 1998). To prevail on a claim for IIED, a plaintiff must prove: "(1) defendants acted intentionally or recklessly, both in doing the act and producing the emotional distress; (2) defendants' conduct was outrageous and extreme, so as to go beyond the bounds of all decency and be utterly intolerable in a civilized community; (3) defendants' actions were the proximate cause of the plaintiff's emotional distress; and (4) the distress suffered was so severe that no reasonable person could be expected to endure it." *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 532 (D.N.J. 2008) (citing *Buckley v. Trenton Sav. Fund Soc.*, 111 N.J. 355, 365 (1988)). "It is the responsibility of the court to determine as a matter of law whether the required level of distress could reasonably be found." *Ramirez*, 998 F. Supp. at 434

Here, Defendants have pointed the Court to the "absence of evidence [] support[ing]" Shann's claim for IIED. *Celotex*, 477 U.S. at 325. Specifically, Defendants note that the record is devoid of facts "to suggest that Defendants either (1) acted outrageously with the intent to cause Plaintiff severe emotional distress, or (2) acted recklessly to the high possibility of causing severe emotional distress." (Mov. Br. at 37).

Shann's Opposition fails to raise a triable issue of material fact. In fact, rather than provide the Court with specific citations to record evidence supporting the assertions that Pierce "intentionally fabricated information, misled his superiors, and lied to law enforcement officers . . . in order to conceal the discriminatory termination of [Shann's] employment," Shann just refers

the Court to other portions of his opposition brief. (Opp. Br. at 38) ("For purposes of brevity, Plaintiff refers the court to the facts outlined *supra* at Points III and V.").

Shann has the burden of identifying what facts might support a reasonable inference that Defendants either (1) acted outrageously with the intent to cause Plaintiff severe emotional distress, or (2) acted recklessly to the high possibility of causing severe emotional distress." (Mov. Br. at 37); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (stating that the party opposing summary judgment must "set forth specific facts showing that there is a genuine issue for trial"). "It is not the Court's responsibility to comb the record on behalf of Plaintiff's counsel." *Baker v. The Hartford Life Ins. Co.*, No. 08-6382, 2010 WL 2179150, at *2 (D.N.J. May 28, 2010).

Accordingly, the Court GRANTS Defendants' motion for summary judgment on Count V.

### F. Count VI: Abuse of Process

#### i. The Parties' Arguments

Defendants move for summary judgment on Shann's abuse-of-process claim. According to Defendants, Shann's abuse-of-process claim fails because he cannot show how "Defendants allegedly perverted the process after the criminal action had been instituted." (Mov. Br. at 39). Shann responds that Pierce "committed a further act in an effort to cause the improper prosecution of [Shann]"—namely, emailing prosecutors "portions of [Atlantic Health's] telecommuting policy, while deliberately omitting the supplement to the policy which would have authorized Shann to possess and remove equipment." (Opp. Br. at 39).

#### ii. Analysis

To establish a claim for abuse of process, Plaintiff must show: "(1) an ulterior motive and (2) some further act after an issuance of process representing the perversion of the legitimate use of process." *Stolinski v. Pennypacker*, 772 F. Supp. 2d 626, 644 (D.N.J. 2011). To be clear, "the

process that must have been abused includes the summons, mandate, or writ used by a court to compel the appearance of the defendant in a legal action or compliance with its order." *Id.*

Importantly, "process is not abused unless after its issuance the defendant reveals an ulterior purpose he had securing it by committing 'further acts' whereby he demonstrably uses the process as means to coerce or oppress the plaintiff." *Ruberton v. Gabage*, 280 N.J. Super. 125, 130 (App. Div. 1995) (explaining that abuse of process requires application of judicial power to achieve improper ends). "The typical abuse of process claim involves leveraging some attachment process or complaint in order to achieve some other end." *Stolinski*, 772 F. Supp. at 644; *see also Wozniak v. Pennella*, 373 N.J. Super. 445, 449 (App. Div. 2004) (addressing abuse-of-process claim that a landlord filed a criminal complaint against a tenant, and then attempts to use the criminal complaint as leverage to induce the tenant to withdraw his pending civil action against the landlord).

The Court finds that Shann's abuse-of-process claim fails as a matter of law because there is no genuine issue of material fact as to whether Defendants "perverted [the] use of process after it has been issued." *Ash v. Cohn*, 119 N.J.L. 54, 58 (1937). As Defendants note, and Shann does not contest, Shann's termination cannot constitute the requisite "further act" necessary to establish the second element. (Mov. Br. at 39). Shann points to no evidence from which a reasonable factfinder could conclude that his termination was the result of the criminal proceedings. *See, e.g.*, *supra* at 14-16. To be sure, Defendants provided Shann with the reasons for his termination— none of which included any reference to his criminal proceedings.

Furthermore, Shann's argument that Pierce abused the "process" when he emailed prosecutors Atlantic Health's telecommuting agreement, but failed to send the supplement to the

policy, is meritless.[16]  (Opp. Br. at 39-40).  Even if the Court assumes Pierce schemed to provide prosecutors with false inculpatory documents and failed to provide exculpatory documents, Shann's abuse of process claim would still fail.  *See Mosley v. Delaware River Port Auth.*, No. 99-4147, 2000 WL 1534743, at *9 (D.N.J. Aug. 7, 2000) (noting that "process" does not include false testimony).

The relevant inquiry for the Court is whether Pierce committed a "further act . . . representing the perversion of the legitimate use of process."  *SBK Catalogue P'ship v. Orion Pictures Corp.*, 723 F. Supp. 1053, 1067 (D.N.J. 1989).  Here, the record is devoid of any indication that any of the Defendants used Shann's criminal proceedings to "coerce [him] into doing something or to extort something from [him]."  *Mosley*, 2000 WL 1534743, at *10 (explaining that abuse of process claims are reserved for cases in which a person uses the process "for a collateral purpose that is not properly obtainable and is totally extraneous to the legitimate use of the process").

Accordingly, the Court GRANTS summary judgment in favor of Defendants on Count VI.

### G.  Count VII: Malicious Prosecution

#### i.  The Parties' Arguments

Defendants move for summary judgment on Shann's malicious prosecution claim because "Plaintiff cannot demonstrate that Defendants lacked probable cause when they informed the police of suspected criminal conduct."  (Mov. Br. at 27).  Shann responds: "Pierce did not possess probable cause that Shann stole anything."  (Opp. Br. at 29).

---

[16]    As explained above, the supplement does not provide support for the proposition that Shann was authorized to take home computer equipment generally on August 16, 2011.

### ii. Analysis

"Malicious prosecution provides a remedy for harm caused by the institution or continuation of a criminal action that is baseless." *LoBiondo v. Schwartz*, 199 N.J. 62, 89 (2009). To prevail on a malicious prosecution claim, a plaintiff must prove "(1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff." *Lind v. Schmid*, 67 N.J. 255, 262 (1975). "A plaintiff must also show that the conduct constituting institution of the action was the proximate cause of the charges being brought (i.e., the chain of causation was not interrupted by an intervening agent). *Stolinski*, 772 F. Supp. 2d at 638.

Importantly, [t]he essence of the cause of action is lack of probable cause, and the burden of proof rests on the plaintiff." *Lind*, 67 N.J. at 262. To prevail, a "plaintiff must establish a negative, namely, that probable cause did not exist." *Id.* Probable cause is defined as "reasonable grounds for suspicion supported by circumstances sufficiently strong in themselves to warrant an ordinarily cautious man in the belief that the accused is guilty of the offense which he is charged." *Id.* "The plaintiff must demonstrate that at the time when the defendant put the proceedings in motion the circumstances were such as not to warrant an ordinarily prudent individual in believing that an offense has been committed." *Id.*

Although probable cause is a fact-laden issue and normally a question for the jury, summary judgment is appropriate if, taking all of the plaintiff's allegations as true and resolving all inferences in his favor, a reasonable jury could not find in his favor. *See Montgomery v. De Simone,* 159 F.3d 120, 124 (3d Cir. 1998). This can happen if the undisputed facts material to

probable cause would mean that no reasonable jury could find a lack of probable cause, regardless of how the jury determined the disputed facts. *Stolinski*, 772 F. Supp. 2d at 638.

Here, the Court is satisfied that the uncontested evidence establishes probable cause for the prosecution Pierce initiated against Shann. To determine whether probable cause existed, the Court must determine whether the state of facts were "such as to lead a person of ordinary prudence to believe on reasonable grounds the truth of the charge at the time it was made." *Brunson v. Affinity Fed. Credit Union*, 199 N.J. 381, 398 (2009) (rejecting the plaintiff's attempt to view the probable-cause determination through the "harsh and unforgiving glare of hindsight").

The undisputed facts are as follows. On the morning of August 17, 2011, Ishaque informed Pierce about Shann's alleged plan. (Defs. SMF ¶¶ 58-61; Pl. RSMF ¶¶ 58-61). According to Ishaque, Shann planned to take a short-term leave of absence, followed by a long-term leave of absence. (Defs. SMF ¶¶ 60-61; Pl. SMF ¶¶ 60-61). Then, after exhausting his leaves of absences, Shann would resign his position and focus on expanding Info-Prompt. (*Id.*). Moments later, when Shann informed Pierce both about his intent to start an extended leave of absence and that "it would be beneficial to the team if [Pierce] got somebody to fill [his] position," at least some of Ishaque's statements to Pierce appeared to be supported. (Pierce Dep. at 137:3-12).

Ishaque also informed Pierce that, just the day before, Shann was "copy[ing] all Microsoft stuff" to a hard disk and that he was taking other equipment home. Specifically, Ishaque noted that Shann was taking two laptops home, an iPad, an iPhone, hard disks, and other equipment he could not identify. (Defs. SMF ¶ 61; Pl. SMF ¶ 61). This statement was then corroborated not only by surveillance footage—where Shann can be seen twice walking out of the facility carrying computer hardware—but also another co-worker's written statement that attested to observing Shann leave the facility with equipment. (Defs. SMF ¶ 72; Pl. SMF ¶ 72).

Atlantic Health Security then found that Shann removed two of the three hard drives from his workstation's computer, which required Shann to open the computer tower, unplug the hard drives, and remove them. (*Id.*; *see also* Shann Dep. I at 224:1-2). Atlantic Health studied the remaining hard drive and found that "in excess of 27,000 files were overwritten" with third-party software "that is intended to clear your tracks." (D.E. No. 108, Ex. 41 at 6). Thus, based on all the uncontested evidence, no reasonable trier of fact would find the absence of probable cause.

Shann makes three counterarguments. First, Shann argues that Pierce did not have probable cause because "Ishaque had significant communication issues on account of a language barrier" and he "misunderstood what Shann communicated to him." (Opp. Br. at 29). Ishaque's alleged "language barrier," however, has no impact on whether Pierce had probable cause. Even if the Court assumes that Ishaque has significant communication issues, Shann ignores that McKenna, Atlantic Health Security, and Officer Sutherland all spoke to Ishaque. Ishaque's "ensuing credibility problems go to his effectiveness as a witness, and perhaps to his veracity, but not to what [Pierce] reasonably believed after taking [Ishaque's] statement and referring the matter for criminal prosecution." *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243, 250 (D.N.J. 2001). Thus, Shann's allegation of Ishaque's "communication issues" does not undermine the Court's finding that Pierce had probable cause.

Second, Shann argues that probable cause did not exist because "Pierce had the opportunity to clarify matters directly with Shann, but amazingly said nothing." (Opp. Br. at 31). Whether Pierce could have or should have clarified matters with Shann is irrelevant to this Court's determination of whether probable cause existed. "The reasonable belief which constitutes probable cause does not require [a complainant] to evaluate the totality of circumstances, both inculpatory and exculpatory, as a trier of fact guided by a reasonable doubt standard." *Carollo v.*

*Supermarkets Gen. Corp.*, 251 N.J. Super. 264, 271 (App. Div. 1991). Moreover, "[a] failure to investigate potentially relevant facts is irrelevant to the determination of whether the facts then in possession of investigators were a sufficient basis for probable cause." *Stolinski*, 772 F. Supp. 2d at 638. Thus, Shann's argument that Pierce could have clarified matters with Shann is insufficient to undermine the Court's finding of probable cause.

Lastly, Shann argues that Pierce "deliberately provided false information, withheld information, and misrepresented facts to law enforcement to create the appearance that Shann committed theft." (Opp. Br. at 32). In support of his assertion, Shann provides citations to the record that do not exist,[17] misrepresents the record, or cites facts that merely reiterate the argument that Pierce could have done more before contacting Officer Sutherland. (*See, e.g., id.* at 32-34). Shann does note, however, that Pierce learned that the "new laptop in a box" Shann removed was a "life cycle" replacement laptop. (*Id.* at 33-34).

Nevertheless, in light of the uncontested evidence, Pierce's knowledge that Shann took his "life cycle" replacement laptop—in addition to his old laptop—does not undermine the existence of probable cause. As Pierce explained,

> Mr. Shann had a laptop that was functional that was working at the time that had everything that was needed on it. He had conveyed to me that he was leaving to go on an indefinite FMLA. While on the FMLA leave . . . nobody would be working on anything while they're gone there. So to be prepared or to take any amount of equipment, that amount of equipment . . . out of one of the corporate buildings is not only extremely unusual, I've never seen it before.

(Pierce Dep. II at 269:13-271:11).

If Pierce relied only on the fact that Shann took his life cycle replacement laptop home, then Shann may have put forth enough evidence to undermine Pierce's finding of probable cause.

---

[17] For example, Shann cites to paragraphs 61, 66, and 75 of his Counter Statement of Undisputed Facts. (*See* Opp. Br. at 33). A review of Shann's Counter Statement of Undisputed Facts reveals that these paragraphs do not exist. (*See* D.E. No. 102-2).

But here, not only did Shann take his old and new laptops home, he also removed other computer equipment, including two hard drives from his workstation's tower—all before going on an indefinite FMLA leave. Thus, the uncontested evidence provides the circumstances "to lead a person of ordinary prudence to believe on reasonable grounds the truth of the charge at the time it was made." *Brunson*, 199 N.J. at 398.

For these reasons, the Court GRANTS Defendants' motion for summary judgment on VII.

**IV.    CONCLUSION**

For the reasons set forth above, the Court GRANTS Defendants' motion for summary judgment on Counts II, V, VI, and VII, and DENIES-IN-PART and GRANTS-IN-PART Defendants' motion for summary judgment on Counts I, III and IV.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**
